[No. S146979. May 3, 2007.]

STAN BRODIE, Petitioner, v.
WORKERS' COMPENSATION APPEALS BOARD and CONTRA COSTA
COUNTY FIRE PROTECTION DISTRICT, Respondents.

[No. S147030. May 3, 2007.]

KENNETH DEE WELCHER, Petitioner, v.
WORKERS' COMPENSATION APPEALS BOARD and HAT CREEK
CONSTRUCTION, INC., et al., Respondents.

[No. C051409. May 3, 2007.]

JACK STRONG, Petitioner, v.
WORKERS' COMPENSATION APPEALS BOARD and CITY AND
COUNTY OF SAN FRANCISCO, Respondents.

[No. C051790. May 3, 2007.]

AURORA LOPEZ, Petitioner, v.
WORKERS' COMPENSATION APPEALS BOARD and DEPARTMENT
OF SOCIAL SERVICES et al., Respondents.

[No. C051894. May 3, 2007.]

HENRY L. WILLIAMS, JR., Petitioner, v.
WORKERS' COMPENSATION APPEALS BOARD and UNITED
AIRLINES, Respondents.

COUNSEL

Gearheart & Otis and Mark E. Gearheart for Petitioner Stan Brodie.

Gearheart & Otis and Roy Otis for Petitioner Jack Strong.

DuRard, McKenna & Borg and Susan R. Borg for Petitioner Henry L. Williams, Jr.

Leep & Tescher and M. K. Tescher, Jr., for Petitioners Kenneth Dee Welcher and Aurora Lopez.

David J. Froba for California Applicants' Attorneys Association as Amicus Curiae on behalf of Petitioner Stan Brodie.

Thomas, Lyding, Cartier & Gaus, William R. Thomas and Douglas E. Starns for Respondent Contra Costa County Fire Protection District.

Dennis J. Herrera, City Attorney, Rebecca Liu, Danny Chou and M. Diane Weber, Deputy City Attorneys, for Respondent City and County of San Francisco.

Robert W. Daneri, Suzanne Ah Tye and David M. Goi for Respondents California Department of Social Services/IHSS, State Compensation Insurance Fund, Adjusting Agent and Hat Creek Construction, Inc.

Laughlin, Falbo, Levy & Moresi, Shari E. Levy; Grancell, Lebovitz, Stander, Barnes & Reubens and Lawrence Kirk for Respondent United Airlines.

No appearance for Respondent Workers' Compensation Appeals Board.

Law Offices of Saul Allweiss, Michael A. Marks; Finnegan, Marks, Hampton & Theofel and Ellen Sims Langille for California Workers' Compensation Institute as Amicus Curiae on behalf of Respondents.

Sedgwick, Detert, Moran & Arnold and Christina J. Imre for California Chamber of Commerce, Agricultural Council of California, Association of California Insurance Companies, Associated General Contractors of California, California Business Roundtable, California Farm Bureau Federation, California Grocers Association, California Hotel and Lodging Association, California Restaurant Association, California Retailers Association, California Business Properties Association, California Manufacturers & Technology Association, National Federation of Independent Business Legal Foundation, Western Growers Association and WSPA as Amici Curiae on behalf of Respondents.

Raymond G. Fortner, Jr., County Counsel (Los Angeles), Patrick A. Wu, Assistant County Counsel, and Leah D. Davis, Deputy County Counsel, for County of Los Angeles as Amicus Curiae on behalf of Respondents.

Jones Day, Ellwood Lui, Peter E. Davids; Raymond G. Fortner, Jr., County Counsel (Los Angeles), Charles Safer, Assistant County Counsel, and Rosanne Wong, Deputy County Counsel, for Los Angeles County Metropolitan Transportation Authority as Amicus Curiae on behalf of Respondents.

OPINION

**WERDEGAR, J.**—These consolidated cases present the following question: When a worker suffers an industrial injury that results in permanent disability, how should the compensation owed based on the current level of permanent disability be discounted for either previous industrial injury or nonindustrial disabilities? The issue was originally settled by this court in *Fuentes v. Workers' Comp. Appeals Bd.* (1976) 16 Cal.3d 1 [128 Cal.Rptr. 673, 547 P.2d 449] (*Fuentes*), but the 2004 omnibus reform of California's workers' compensation scheme created doubt as to whether the apportionment formula we adopted in *Fuentes* had been superseded and a different formula should now be employed. We conclude it has not been superseded and the *Fuentes* formula remains the correct one to apply in apportioning compensation between causes of disability.

FACTUAL AND PROCEDURAL BACKGROUND

These cases arise from five workers' compensation proceedings with widely differing facts but two unifying aspects. First, in each the injured worker's current permanent disability level could be attributed in part to one or more previous industrial injuries or to nonindustrial causes. Second, in each the workers' compensation judge (WCJ) applied the *Fuentes* apportionment method, under compulsion of the Workers' Compensation Appeals Board's (Board) divided en banc decision holding that notwithstanding the 2004 legislation, the *Fuentes* method of calculating apportionment was still correct. (See *Nabors v. Piedmont Lumber & Mill Co.* (2005) 70 Cal.Comp.Cases 856, 862 (en banc) (*Nabors I*).)

Stan Brodie, a firefighter for the Contra Costa County Fire Protection District, sustained an industrial injury to his back, spine, and right knee in December 2000 and subsequent cumulative trauma to his back and spine that resulted in a 74 percent permanent disability. Over the previous 30 years of his career as a firefighter, Brodie had sustained several industrial injuries to the same body parts for which he was awarded compensation based on a 44.5 percent permanent disability rating.[1] The WCJ awarded him $20,867.50 in compensation based on the difference between these ratings, 29.5 percent, and the Board denied reconsideration.

Kenneth Dee Welcher sustained an industrial injury in July 1990 when his right arm and leg were caught in a conveyor belt. His permanent disability level was stipulated at 62.5 percent. His current claim arose from cumulative injury to his right leg sustained as a laborer for Hat Creek Construction, Inc. Welcher had his right leg amputated below the knee, and the parties stipulated to a 71 percent permanent disability rating. The WCJ awarded Welcher $3,360 in compensation based on the difference between these ratings, 8 percent (rounding down), and the Board denied reconsideration.

Jack Strong, a City and County of San Francisco engineer, suffered a 1995 industrial left knee injury and received a 34.5 percent permanent disability rating. In 1999, he sustained additional industrial injuries to his left shoulder, left knee, left ankle, and right wrist, resulting in permanent disability of 42 percent. In 2002, he sustained a third industrial injury while working for the city, this time to his back. The parties stipulated that Strong's overall level of permanent disability was now 70 percent. Based on evidence from a disability evaluation specialist, the WCJ determined the current injury caused permanent disability of 10 percent, with the remaining 60 percent attributable

---

[1] The WCJ disregarded additional industrial injuries to other body parts, as they did not overlap with the current injuries and thus provided no basis for apportionment.

to the previous injuries, and awarded $4,235. The Board granted reconsideration but thereafter affirmed the award. (*Strong v. City & County of San Francisco* (2005) 70 Cal.Comp.Cases 1460 (en banc).)

Aurora Lopez, a Department of Social Services employee, injured her back and lower extremities; the parties stipulated she was 100 percent permanently disabled and stipulated further that 79 percent of this was attributable to the industrial injury and 21 percent to nonindustrial causes. The WCJ awarded Lopez permanent disability benefits of $80,910.73, plus a small life pension based on disability in excess of 70 percent, and the Board denied reconsideration.

Henry L. Williams, Jr., a United Airlines mechanic, injured his lumbar spine and received a 28 percent permanent disability rating. Thereafter, in 2003 Williams injured his spine again, and the parties stipulated to a 43 percent permanent disability rating. The WCJ awarded $9,296.25 in permanent disability benefits based on the difference, 15 percent, and the Board denied reconsideration.

In *Brodie v. Workers' Comp. Appeals Bd.*, the First District Court of Appeal, Division Three, granted writ review and annulled the Board's decision. It agreed with earlier Court of Appeal decisions from the Fifth District and First District, Division Two, insofar as they held that the 2004 legislation superseded *Fuentes*. (*E & J Gallo Winery v. Workers' Comp. Appeals Bd.* (2005) 134 Cal.App.4th 1536, 1548–1550 [37 Cal.Rptr.3d 208] (*Dykes*);[2] *Nabors v. Workers' Comp. Appeals Bd.* (2006) 140 Cal.App.4th 217, 228 [44 Cal.Rptr.3d 312] (*Nabors II*).) As we shall discuss, it disagreed in other respects, concluding that the correct method for calculating an award was a third approach different from that adopted either in *Fuentes* or in *Dykes* and *Nabors II*.

In *Welcher v. Workers' Comp. Appeals Bd.*, the Third District consolidated the cases of Welcher, Strong, Lopez, and Williams and affirmed, expressly disagreeing with *Dykes* and *Nabors II* and holding, in agreement with the Board majority in *Nabors I*, *supra*, 70 Cal.Comp.Cases at page 862, that the *Fuentes* formula was still correct.

We granted review to resolve the split of authority.

---

[2] Workers' compensation decisions are often referred to by the name of the injured worker. *E & J Gallo Winery v. Workers' Comp. Appeals Bd.*, *supra*, 134 Cal.App.4th 1536, generally has been referred to as the *Dykes* decision by courts, commentators, and practitioners.

## Discussion

We take as a given that each injured worker in these cases has a level of permanent disability and that some but not all of that current level of permanent disability is properly apportioned to the most recent industrial injury. The common question we must answer is: How should compensation for that portion be computed?

### I. *The Apportionment Problem*

California's workers' compensation system was established to provide for the health, safety, and welfare of workers in the event of industrial injury by " 'relieving [them] from the consequences of any injury incurred by employees in the course of their employment.' " (*Mathews v. Workmen's Comp. Appeals Bd.* (1972) 6 Cal.3d 719, 731, fn. 8 [100 Cal.Rptr. 301, 493 P.2d 1165], quoting Stats. 1917, ch. 586, § 1, p. 832; see also *Claxton v. Waters* (2004) 34 Cal.4th 367, 372 [18 Cal.Rptr.3d 246, 96 P.3d 496].)

■ The panoply of benefits the system provides includes compensation for permanent disability. "[P]ermanent disability is understood as 'the irreversible residual of an injury.' " (*Kopping v. Workers' Comp. Appeals Bd.* (2006) 142 Cal.App.4th 1099, 1111 [48 Cal.Rptr.3d 618], quoting 1 Cal. Workers' Compensation Practice (Cont.Ed.Bar 4th ed. 2005) § 5.1, p. 276, italics omitted.) "A permanent disability is one '. . . which causes impairment of earning capacity, impairment of the normal use of a member, or a competitive handicap in the open labor market.' " (*State Compensation Ins. Fund v. Industrial Acc. Com.* (1963) 59 Cal.2d 45, 52 [27 Cal.Rptr. 702].) Thus, permanent disability payments are intended to compensate workers for both physical loss and the loss of some or all of their future earning capacity. (Lab. Code, § 4660, subd. (a);[3] *Livitsanos v. Superior Court* (1992) 2 Cal.4th 744, 753 [7 Cal.Rptr.2d 808, 828 P.2d 1195].)

Permanent disability payments are calculated by first expressing the degree of permanent disability as a percentage[4] and then converting that percentage into an award based on a table. (§ 4658.) Until April 1972, the table was straightforward: an injured worker received four weeks of benefits for each percentage point of disability. (Former § 4658, added by Stats. 1959, ch. 1189, § 13, p. 3280; *Fuentes, supra,* 16 Cal.3d at p. 4.) Thus, for example, a worker

---

[3] All further unlabeled statutory references are to the Labor Code.

[4] Notably, however, "[t]he percentage level of permanent disability represents only a point on a relative scale." (1 Hanna, Cal. Law of Employee Injuries and Workers' Compensation (rev. 2d ed. 2007) § 8.02[2], p. 8-6.) Thus, a rating of 50 percent has no real world significance, other than to indicate that the injured worker is more disabled than someone with a 45 percent rating and less disabled than someone with a 55 percent rating.

determined to have suffered a 10 percent permanent disability would receive 40 weeks of benefits, while one with a 90 percent disability would receive 360 weeks of benefits.

■    Employers must compensate injured workers only for that portion of their permanent disability attributable to a current industrial injury, not for that portion attributable to previous injuries or to nonindustrial factors. "Apportionment is the process employed by the Board to segregate the residuals of an industrial injury from those attributable to other industrial injuries, or to nonindustrial factors, in order to fairly allocate the legal responsibility." (*Ashley v. Workers' Comp. Appeals Bd.* (1995) 37 Cal.App.4th 320, 326 [43 Cal.Rptr.2d 589].) Under the pre-1972 table, apportionment to previous injuries was relatively straightforward. Because the additional compensation for each additional percentage point of disability was linear, it mattered not whether one focused on the difference in percent between the current level of disability and the previous level of disability, or the difference in dollars between the payout at the current level of disability and the payout at the previous level of disability; either method of subtraction would lead to the same current award.

However, in 1971 the Legislature amended the table to create a sliding scale of benefits and more generously compensate for more severe disabilities. Under the new table, benefits rose not linearly but exponentially. Thus, for example, under the revised table a worker with a 10 percent disability would receive approximately three weeks of benefits for each percent of disability (for an award of 30.25 weeks), while a worker with a 90 percent disability would receive approximately six weeks of benefits for each percent of disability (for an award of 541.25 weeks). (Former § 4658, Stats. 1971, ch. 1750, § 5, p. 3776; *Fuentes, supra,* 16 Cal.3d at p. 4.)

This amendment created a new apportionment problem in situations where a previously disabled worker suffered a new injury. Consider again the worker who was already 10 percent disabled, but after the new injury was 90 percent disabled. Under the new tables, the difference between the award for a 90 percent disability and the award for a 10 percent disability was no longer equal to the award for an 80 percent disability, the difference between these two disability levels.[5] Thus, it mattered whether one either (1) calculated the

---

[5] Subsequent amendments have created even starker differences in the compensation for different disability levels. Injured workers now receive three weeks of payments for each disability percent below 10 percent, but 16 weeks for each percent above 70 percent (§ 4658, subd. (d)(1)); the amount of the weekly payments rises once various threshold percentages (15, 25, and 70) are reached (§ 4453, subd. (b)); and a life pension is required for permanent disabilities of 70 percent or greater (§ 4659).

percentage of disability attributable to the new injury by subtracting the old rating from the new rating, then consulted the table for the award due this difference (an approach dubbed "formula A" (*Fuentes, supra,* 16 Cal.3d at p. 5)), or (2) consulted the table for the award due at the new disability rating, then subtracted from that the amount that would have been awarded under the old disability rating (an approach dubbed "formula C" (*ibid.*)).[6]

## II. Fuentes v. Workers' Compensation Appeals Board

This court resolved the apportionment problem in *Fuentes*, concluding based on statutory interpretation that the formula A approach was correct. Fuentes, the injured worker, was 58 percent permanently disabled, with 33.75 percent of this due to industrial causes and the rest attributable to a nonindustrial disability. In deciding how to determine compensation, we interpreted former section 4750, which provided: "An employee who is suffering from a previous permanent disability or physical impairment and sustains permanent injury thereafter *shall not receive from the employer compensation for the later injury in excess of the compensation allowed for such injury when considered by itself and not in conjunction with or in relation to the previous disability.* [¶] The employer shall not be liable for compensation to such an employee for the combined disability, but only for that portion due to the later injury *as though no prior disability or impairment had existed.*" (Former § 4750, added by Stats. 1945, ch. 1161, § 1, p. 2209, italics added.) This language, we reasoned, required the current industrial portion of the disability to be considered in isolation, wholly independent of any nonindustrial or previous industrial disability. (*Fuentes, supra,* 16 Cal.3d at pp. 5–6.) Thus, a worker with a 60 percent industrial disability, 30 percent current and 30 percent preexisting, and a worker with a 60 percent current disability, 30 percent industrial and 30 percent nonindustrial, should each be treated the same as a worker with a 30 percent industrial disability. We described the policy behind this section and rule as "encourag-[ing] employers to hire the handicapped" (*id.* at p. 5),[7] because an employer

---

[6] Under formula B, discussed in *Fuentes, supra,* 16 Cal.3d at page 5, one consults the table for the number of weeks of statutory benefits due at the new disability rating (say, the weeks of benefits for a 90 percent disability in our 90/10 hypothetical) and then multiplies this figure by the portion of current disability attributable to the new injury (in the hypothetical, (90-10)/90 = 88.9 percent). Justice Mosk, the lone dissenter in *Fuentes,* advocated formula B's adoption. (*Id.* at p. 9 (dis. opn. of Mosk, J.).) No party in these cases prefers formula B; instead, as in *Fuentes,* the employers and insurers argue for formula A, while the workers argue for one version or another of formula C.

[7] As an earlier court once put it, former section 4750 was intended to remove any employer excuse for "refus[ing] to hire one-armed, one-legged, or one-eyed men." (*Wolski v. Industrial Acc. Com.* (1945) 70 Cal.App.2d 427, 432 [161 P.2d 283].)

who did so would not have to fear greater compensation costs if a worker with a preexisting disability were to be injured. Accordingly, we adopted formula A, which alone among the proposed formulas apportioned to every current industrial disability of a given level the same compensation, irrespective of previous or nonindustrial disabilities. (*Fuentes*, at p. 6.)

Fuentes argued that this rule was inconsistent with the revised section 4658's adoption of progressive sliding-scale payments. We disagreed, explaining that section 4658 should be read as "a general provision establishing the amount of compensation benefits for a permanent disability, and section 4750 . . . as a specific rule limiting the benefits available in those cases where the employee has a preexisting permanent disability and thereafter sustains a further permanent injury." (*Fuentes, supra*, 16 Cal.3d at p. 7.) We also rejected the argument that section 3202, which requires that the workers' compensation statutes be read liberally in favor of extending benefits to injured workers (see *Claxton v. Waters, supra*, 34 Cal.4th at p. 373), required a different result; where the Legislature's intent in enacting a particular statute is clear, section 3202's general rule of liberal construction will not compel a contrary result. (*Fuentes*, at p. 8.)

*Fuentes* involved apportionment between industrial and nonindustrial disabilities, but nothing in the majority opinion suggested former section 4750 might be read differently when apportioning between a current industrial disability and a previous one. Thereafter, the courts and the Board routinely applied formula A in apportioning between industrial disabilities as well. (E.g., *Department of Education v. Workers' Comp. Appeals Bd.* (1993) 14 Cal.App.4th 1348, 1353 [18 Cal.Rptr.2d 900]; *Ramirez v. Workers' Comp. Appeals Bd.* (2001) 66 Cal.Comp.Cases 1128, 1129–1131.)

III. *Senate Bill No. 899 and Its Application to the Apportionment Problem*

So the law stood, settled, for 28 years. Then in 2004, the Legislature enacted omnibus reform of the workers' compensation system. Of significance here, Senate Bill No. 899 (2003–2004 Reg. Sess.) overhauled the statutes governing apportionment, repealing both section 4663 and section 4750—the statute we relied on in *Fuentes, supra*, 16 Cal.3d 1, as compelling adoption of formula A—and enacting a revised section 4663 and new section 4664. (Stats. 2004, ch. 34, §§ 33 [repealing former § 4663], 34 [revising § 4663], 35 [adding new § 4664], 37 [repealing former § 4750].) These changes raised the question: Is the *Fuentes* formula A approach still valid?

The Board and various Courts of Appeal have reached three different conclusions. Some, like the Court of Appeal in *Welcher* and the Board majority, hold that formula A is still correct. (*Nabors I, supra*, 70 Cal.Comp.Cases at p. 862 (en banc).) Others reason that by repealing section 4750, Senate Bill No. 899 (2003–2004 Reg. Sess.) effectively superseded *Fuentes*, and formula C is now correct. (*Dykes, supra*, 134 Cal.App.4th at p. 1553; *Nabors II, supra*, 140 Cal.App.4th at p. 228 [following *Dykes*]; *Nabors I, supra*, at p. 864 (dis. opn. of Comr. Caplane).) The Court of Appeal in *Brodie* adopted a third approach, holding that while *Fuentes* has been superseded, the correct formula is a modification of formula C in which one subtracts not the actual award previously paid out in old dollars, but the award for that previous percentage disability that would be due today in current dollars.[8]

Having reviewed both the language of Senate Bill No. 899 (2003–2004 Reg. Sess.) and its legislative history, we conclude formula A, the formula approved by *Fuentes*, remains the law.

█ In interpreting the new provisions enacted by Senate Bill No. 899 (2003–2004 Reg. Sess.), our goal is to divine and give effect to the Legislature's intent. (*Elsner v. Uveges* (2004) 34 Cal.4th 915, 927 [22 Cal.Rptr.3d 530, 102 P.3d 915].) We begin with a comparison and analysis of the language of the old and new statutes. (See *DuBois v. Workers' Comp. Appeals Bd.* (1993) 5 Cal.4th 382, 387 [20 Cal.Rptr.2d 523, 853 P.2d 978].) Former section 4663 provided only limited apportionment where an industrial injury aggravated a preexisting disease or condition: "In case of aggravation of any disease existing prior to a compensable injury, compensation shall be allowed only for the proportion of the disability due to the aggravation of such prior disease which is reasonably attributed to the injury." (Former § 4663, added by Stats. 1937, ch. 90, p. 284 and repealed by Stats. 2004, ch. 34, § 33.) In contrast, revised section 4663, subdivision (a) provides: "Apportionment of permanent disability shall be based on causation." Subdivision (b) requires physicians preparing permanent disability reports to address causation. Subdivision (c) requires in relevant part that permanent disability reports "include an apportionment determination. A physician shall make an apportionment determination by finding what approximate percentage of the permanent disability was caused by the direct result of injury arising out of and occurring in the course of employment and what approximate percentage of the permanent disability was caused by other factors both before and subsequent to the industrial injury, including prior industrial injuries." (§ 4663, subd. (c).)

---

[8] In dissent in *Nabors I*, then Chairman Rabine advocated a fourth approach, the formula B approach described in *Fuentes, supra*, 16 Cal.3d at page 5. (*Nabors I, supra*, 70 Cal.Comp.Cases at p. 864 (dis. opn. of Chairman Rabine).)

Building on this principle of apportionment according to cause, section 4664, subdivision (a) provides: "The employer shall only be liable for the percentage of permanent disability directly caused by the injury arising out of and occurring in the course of employment." Further, "[i]f the applicant has received a prior award of permanent disability, it shall be conclusively presumed that the prior permanent disability exists at the time of any subsequent industrial injury. This presumption is a presumption affecting the burden of proof." (*Id.*, subd. (b).) The remainder of section 4664 sets limits on cumulative permanent disability awards.

While section 4663, subdivision (a) authorizes apportionment by causation, and section 4664, subdivision (a) confines an employer's liability to the percentage of disability directly caused by the current industrial injury, neither provision specifies how it is to be used in conjunction with section 4658, the table that converts a disability percentage into an actual award. Certainly nothing in current section 4663 or section 4664 expressly requires formulas A, B, C, modified C, or any other approach to calculating compensation. Nor does anything in the language implicitly do so. We thus agree with the Courts of Appeal in *Brodie* and *Dykes* insofar as they recognized that "[i]n adopting Sen[ate] Bill 899, the Legislature did not outline any particular method for apportioning either a permanent disability award or a life pension." (*Dykes, supra*, 134 Cal.App.4th at p. 1552.) Contrary to the arguments of both sides, the plain language of these provisions considered in isolation does not resolve the problem. However, as we shall explain, neither does the repeal of section 4750 (which *did* implicitly compel application of formula A) now require rejection of that formula.

■ The answer to the problem is more readily apparent when we reframe the question and ask: By adopting new and different language governing apportionment, did the Legislature intend to adopt a new and different formula? As we have explained, "[w]e do not presume that the Legislature intends, when it enacts a statute, to overthrow long-established principles of law unless such intention is clearly expressed or necessarily implied." (*People v. Superior Court (Zamudio)* (2000) 23 Cal.4th 183, 199 [96 Cal.Rptr.2d 463, 999 P.2d 686]; accord, *Regency Outdoor Advertising, Inc. v. City of Los Angeles* (2006) 39 Cal.4th 507, 526 [46 Cal.Rptr.3d 742, 139 P.3d 119].) We conclude the answer is no and the formula we approved in *Fuentes* still applies. To explain why this is so, we explore the nature of apportionment and the problem the Legislature was trying to solve.

Until 2004, former section 4663 and case law interpreting the workers' compensation scheme closely circumscribed the bases for apportionment. Apportionment based on causation was prohibited. (*Pullman Kellogg v. Workers' Comp. Appeals Bd.* (1980) 26 Cal.3d 450, 454 [161 Cal.Rptr. 783, 605 P.2d 422] ["It is disability resulting from, rather than a cause of, a disease which is the proper subject of apportionment; 'pathology' may not be apportioned"].) Instead, a disability resulting from industrial and nonindustrial causes was apportionable "only if the [B]oard finds that part of the disability would have resulted from the normal progress of the underlying nonindustrial disease." (*Ibid.*) This rule left employers liable for any portion of a disability that would not have occurred but for the current industrial cause; if the disability arose in part from an interaction between an industrial cause and a nonindustrial cause, but the nonindustrial cause would not alone have given rise to a disability, no apportionment was to be allowed. (*Ballard v. Workmen's Comp. App. Bd.* (1971) 3 Cal.3d 832, 837 [92 Cal.Rptr. 1, 478 P.2d 937] [where an industrial injury "lights up or aggravates a previously existing [nonindustrial] condition resulting in disability, liability for the full disability without proration is imposed upon the employer"]; *Gay v. Workers' Comp. Appeals Bd.* (1979) 96 Cal.App.3d 555, 562 [158 Cal.Rptr. 137] ["In apportioning under [former] Labor Code section 4663 it must be shown that the apportioned percentage of nonindustrial permanent disability would have resulted . . . even in [the] absence of the industrial injury"].)

Under these rules, in case after case courts properly rejected apportionment of a single disability with multiple causes. (See, e.g., *Pullman Kellogg v. Workers' Comp. Appeals Bd.*, *supra*, 26 Cal.3d at pp. 454–455 [no apportionment of lung injury between industrial inhalation of toxic fumes and nonindustrial pack-a-day smoking habit]; *Zemke v. Workmen's Comp. App. Bd.* (1968) 68 Cal.2d 794, 796–799 [69 Cal.Rptr. 88, 441 P.2d 928] [no apportionment of back disability between industrial back injury and nonindustrial arthritis]; *Berry v. Workmen's Comp. App. Bd.* (1968) 68 Cal.2d 786, 788–790 [69 Cal.Rptr. 68, 441 P.2d 908] [no apportionment of knee disability where industrial knee injury triggered "advancement" of previously dormant nonindustrial fungal disease]; *Idaho Maryland etc. Corp. v. Ind. Acc. Com.* (1951) 104 Cal.App.2d 567 [232 P.2d 11] [no apportionment between industrial exposure to mine gas and nonindustrial latent heart disease].) In short, so long as the industrial cause was a but-for proximate cause of the disability, the employer would be liable for the entire disability, without apportionment.

While former section 4663 was interpreted as constraining employers in their ability to show apportionment based on nonindustrial causes, former section 4750 was interpreted as granting employees wide latitude to disprove

apportionment based on prior permanent disability awards by demonstrating that they had substantially rehabilitated the injury. (See, e.g., *National Auto. & Cas. Ins. Co. v. Industrial Acc. Com.* (1963) 216 Cal.App.2d 204 [30 Cal.Rptr. 685].) In *National Auto.*, the employee sustained a back injury and was rated 65 percent permanently disabled. He later sustained a second back injury and was rated 78 percent permanently disabled, but introduced medical testimony, accepted by the Board's predecessor, the Industrial Accident Commission, that he had rehabilitated his injury to the point that he was only 39 percent disabled immediately before the second injury. The Court of Appeal affirmed an award of 78 - 39 = 39 percent disability, not the 78 - 65 = 13 percent the insurer argued for, concluding that former section 4750 permitted proof of rehabilitation. (*National Auto.*, at pp. 207–212; see also *Mercier v. Workers' Comp. Appeals Bd.* (1976) 16 Cal.3d 711, 716, fn. 2 [129 Cal.Rptr. 161, 548 P.2d 361] [approving rehabilitation principle in dicta]; *Robinson v. Workers' Comp. Appeals Bd.* (1981) 114 Cal.App.3d 593 [171 Cal.Rptr. 48] [rejecting any apportionment under former § 4750, despite prior permanent disability award, where evidence showed full rehabilitation between first and second injury].)

The plain language of new sections 4663 and 4664 demonstrates they were intended to reverse these features of former sections 4663 and 4750. (*Kleemann v. Workers' Comp. Appeals Bd.* (2005) 127 Cal.App.4th 274, 284–285 & fns. 25–27 [25 Cal.Rptr.3d 448].) Thus, new sections 4663, subdivision (a) and 4664, subdivision (a) eliminate the bar against apportionment based on pathology and asymptomatic causes (*E.L. Yeager Construction v. Workers' Comp. Appeals Bd.* (2006) 145 Cal.App.4th 922, 926–927 [52 Cal.Rptr.3d 133]; *Escobedo v. Marshalls* (2005) 70 Cal.Comp.Cases 604, 617 (en banc)), while section 4664, subdivision (b) was intended to reverse the rule based on former section 4750 that permitted an injured employee to show rehabilitation of an injury for which a permanent disability award had already been issued (*Kopping v. Workers' Comp. Appeals Bd., supra*, 142 Cal.App.4th at p. 1115; *Sanchez v. County of Los Angeles* (2005) 70 Cal.Comp.Cases 1440, 1452 (en banc)).

This explains the Legislature's purpose in adopting a revised section 4663 and a new section 4664. Further, one can see why it was necessary to repeal former sections 4663 and 4750. These provisions, as interpreted by the courts, were inconsistent with the new regime of apportionment based on causation, as well as the conclusive presumption that previous permanent disability still existed for apportionment purposes.[9] (§§ 4663, subd. (a), 4664,

---

[9] As previously noted, former section 4750 had been interpreted as allowing workers' compensation judges to disregard a previous disability or impairment in making apportionment decisions where the applicant proved rehabilitation, a rule squarely at odds with new section 4664, subdivision (b).

subds. (a), (b).) Former section 4750 required consideration of the new injury "by itself and not in conjunction with or in relation to the previous disability or impairment" and further called for compensation for the later injury to be determined "as though no prior disability or impairment had existed." But under Senate Bill No. 899 (2003–2004 Reg. Sess.), the new approach to apportionment is to look at the current disability and parcel out its causative sources—nonindustrial, prior industrial, current industrial—and decide the amount directly caused by the current industrial source. This approach requires thorough consideration of past injuries, not disregard of them. Thus, repeal of section 4750 was necessary to effect the Legislature's purposes in adopting a causation regime.

Given that repeal of section 4750 was necessary to carry out the Legislature's intended switch to apportionment by causation, and that intended switch alone provides a sufficient explanation for the repeal, it is unnecessary to impute to the Legislature a further intent to also change the long-settled method for computing compensation awards in order to explain its actions. Occam's razor—avoid hypothesizing complicated explanations when a simpler one is available—applies here.[10]

However, because the plain language of the current sections 4663 and 4664 and the repeal of section 4750 do not alone conclusively repudiate any intent to change how disability percentages are converted to compensation awards, we consider as well the legislative history. If the Legislature had intended a departure from formula A, one would expect to find some trace of this intent in the legislative history, just as the legislative history explicitly identifies more than two dozen other intended reforms enacted by Senate Bill No. 899 (2003–2004 Reg. Sess.), including numerous intended changes to the apportionment scheme. As the facts of these five consolidated cases demonstrate, a change from formula A to formula B or either version of formula C would have dramatic fiscal consequences for employers and insurers (as well as, of course, for employees).[11] Such a change, if intended, would likely have been remarked upon.

---

[10] "[T]he principle of Occam's razor—that the simplest of competing theories should be preferred over more complex and subtle ones—is as valid juridically as it is scientifically." (*Swann v. Olivier* (1994) 22 Cal.App.4th 1324, 1329 [28 Cal.Rptr.2d 23], fn. omitted, disapproved on another ground in *Alcaraz v. Vece* (1997) 14 Cal.4th 1149, 1166 [60 Cal.Rptr.2d 448, 929 P.2d 1239].)

[11] For example, under formula A, Kenneth Dee Welcher received $3,360, but he would be entitled to nearly $38,000 plus a life pension under modified formula C or nearly $68,000 plus a life pension under the original formula C. Under formula A, Stan Brodie was awarded just over $20,000, while under modified formula C he would receive $67,700 plus a life pension, or more than $114,000 over his remaining life expectancy. Under formula A, Jack Strong received $4,325, while under the two versions of formula C he would receive between $35,000 and $40,000 plus a life pension, or roughly $59,000 over his life expectancy.

Instead, one hears only silence. The Senate Rules Committee's bill summary exhaustively catalogues the changes wrought by Senate Bill No. 899 (2003–2004 Reg. Sess.) and highlights a series of intended changes in the apportionment rules, the very changes we have already discussed: the bill would "(24) replace present law on apportionment with [a] statement that apportionment of permanent disability is based on causation; (25) require physicians evaluating permanent disability to assess percentage of disability due to work; (26) make[] employer liable only for portion of disability directly caused by injury, [and] restrict[] accumulated percentage of disability for any body region to 100% over lifetime." (Sen. Rules Com., Off. of Sen. Floor Analyses, Conf. Rep. No. 1 on Sen. Bill No. 899 (2003–2004 Reg. Sess.) as amended Apr. 15, 2004, p. 3.) The summary highlights the Legislature's intent to change how one *arrives* at the percentage disability for which an employer or insurer is liable, but makes no mention of any intent to change how that percentage, once arrived at, is to be converted to an award. The same is true of the analyses of the bills that fed into Senate Bill No. 899 (2003–2004 Reg. Sess.); we find in our review of them no mention of any intent to alter the approach to calculating awards based on the percentage attributable to a current industrial injury.[12] This silence offers no reason to believe the Legislature intended to abandon the settled application of formula A.

Several additional considerations buttress this conclusion. First, as Justice Sims noted in his concurring opinion in *Welcher*, Senate Bill No. 899 (2003–2004 Reg. Sess.) was an urgency measure designed to alleviate a perceived crisis in skyrocketing workers' compensation costs. (See Stats. 2004, ch. 34, § 49 [bill urgency measure needed "to provide relief to the state from the effects of the current workers' compensation crisis at the earliest

---

[12] Senate Bill No. 899 (2003–2004 Reg. Sess.) started out as a minor bill designed to change one aspect of workers' compensation wholly unrelated to apportionment. (See Sen. Com. on Labor and Industrial Relations, Analysis of Senate Bill No. 899 (2003–2004 Reg. Sess.) as amended Apr. 21, 2003.) It was but one of 20 different bills to reform workers' compensation passed out of the Senate or Assembly in 2003. (Sen. Rules Com., Off. of Sen. Floor Analyses, Rep. on Sen. Bill No. 899 (2003–2004 Reg. Sess.) as amended July 14, 2003, pp. 2–3.) Senate and Assembly leaders responded to this plethora of overlapping measures by submitting them to a joint conference to digest the bills and incorporate their provisions into a single omnibus reform measure. (Assem. Com. on Insurance, Analysis of Sen. Bill No. 899 (2003–2004 Reg. Sess.) as proposed to be amended July 9, 2003, p. 6.)

Reform of the apportionment process was originally proposed as part of Assembly Bill No. 1481 (2003–2004 Reg. Sess.), Assembly Bill No. 1579 (2003–2004 Reg. Sess.), and Senate Bill No. 714 (2003–2004 Reg. Sess.). Even in the text and committee analyses of these other measures, however, one finds no reflection of an intent to override the settled formula A approach and substitute a different method. (See, e.g., Assem. Com. on Insurance, Analysis of Assem. Bill No. 1481 (2003–2004 Reg. Sess.) as introduced Feb. 22, 2003, pp. 1–2; Sen. Com. on Labor and Industrial Relations, Analysis of Assem. Bill No. 1579 (2003–2004 Reg. Sess.) as proposed to be amended July 9, 2003, p. 4; Sen. Com. on Labor and Industrial Relations, Analysis of Sen. Bill No. 714 (2003–2004 Reg. Sess.) as amended Apr. 21, 2003, pp. 1–2.)

possible time"]; Assem. Republican Caucus, Analysis of Sen. Bill No. 899 (2003–2004 Reg. Sess.) as amended Apr. 15, 2004, p. 6 [listing as first argument in support of the bill the need to reduce the highest state workers' compensation costs in the nation]; Assem. Com. on Insurance, Analysis of Sen. Bill No. 899 (2003–2004 Reg. Sess.) as proposed to be amended July 9, 2003, p. 4 [identifying "crisis" linked to "skyrocketing costs"].) This makes it especially unlikely the Legislature would intend to adopt a new formula giving rise to significant increases in awards without saying so much as a word in either the text of the statutes or the analyses of the proposed changes.[13]

We note as well that in the post-2004 world of apportionment by causation, formula C, the formula advocated by the injured workers and adopted in modified form by the Court of Appeal in *Brodie*, can no longer logically be applied to all cases.

The intuitive appeal of formula C is clearest in a case of two sequential industrial injuries. Assume a first injury that results in 30 percent permanent disability, followed by a second overlapping injury that results in a combined 60 percent permanent disability. Under formula C, though the employer is still only liable for the 30 percent increase in disability, the award is computed based on the compensation for the range of 30 percent disability to

---

[13] While it is true, as the injured workers argue, that some aspects of Senate Bill No. 899 (2003–2004 Reg. Sess.) had the effect of expanding worker benefits (see §§ 139.48 [funding small employer worksite accommodations of disabled workers], 4658, subd. (d)(1) [increasing benefits for workers with 70 percent or greater disability], 4658, subd. (d)(2) [increasing benefits for disabled workers denied prompt return to work], 5402, subd. (c) [providing additional medical benefits]), the modifications to apportionment did not. These included a requirement that doctors include apportionment discussions in their reports (§ 4663, subds. (b), (c)), a prohibition against avoiding apportionment by proving that a prior injury had been rehabilitated (§ 4664, subd. (b)), a cap on awards based on injuries to any one body part (§ 4664, subd. (c)(1)), and a reversal of the case-law-imposed prohibition against apportionment based on cause and corresponding expansion of the range of bases that would trigger apportionment (§ 4663, subd. (a)).

Moreover, the benefit-expanding modifications the injured workers highlight *were* mentioned in Senate Bill No. 899's legislative history. (Sen. Rules Com., Off. of Sen. Floor Analyses, Conf. Rep. No. 1 on Sen. Bill No. 899 (2003–2004 Reg. Sess.) as amended Apr. 15, 2004, pp. 2 [item 16: § 5402 medical benefits; item 21: increased benefits for those with 70 percent or greater disability], 3 [item 3: § 139.48 accommodation funding], 6 [item 14: § 5402 medical benefits], 7 [items 17–18: additional benefits under § 4658]; Assem. Republican Caucus, Analysis of Sen. Bill No. 899 (2003–2004 Reg. Sess.) as amended Apr. 15, 2004, p. 7 [§ 4658, subd. (d)(2) return-to-work incentives; § 5402 medical benefits].) They provide no support for the notion that the Legislature would, sub silentio, change another part of the compensation scheme with potential fiscal consequences dramatically larger than many of the changes highlighted in the bill analyses.

60 percent disability, rather than the range of 0 percent to 30 percent. This has the salutary consequence of ensuring that a 60 percent permanently disabled employee always receives the full compensation indicated by section 4658 for 60 percent permanent disability, irrespective of whether that disability arises from one injury, two injuries, or many.[14]

In cases of apportionment for causation, however, the notion of a "first" 30 percent and a "second" 30 percent will frequently not apply. Where an industrial cause and nonindustrial cause simultaneously interact and are equally responsible for a 60 percent injury, there is no first 30 percent or second 30 percent. There are two possible resolutions to this conundrum, each problematic. Either (1) the original or *Brodie*-modified formula C applies here as well, despite there being no logic or equity to making the employer liable for the more expensive second 30 percent, the range from 30 to 60 percent; or (2) formula C does not apply, in which case either formula B applies, or perhaps formula A still applies, despite the fact that nothing in the statutes suggests the Legislature intended a complicated partial override of the old rule and adoption of a new formula only for a certain subset of apportionment cases.

Finally, the Board has extensive expertise in interpreting and applying the workers' compensation scheme. Consequently, we give weight to its interpretations of workers' compensation statutes unless they are clearly erroneous or unauthorized. (*Honeywell v. Workers' Comp. Appeals Bd.* (2005) 35 Cal.4th 24, 34 [24 Cal.Rptr.3d 179, 105 P.3d 544]; *Judson Steel Corp. v. Workers' Comp. Appeals Bd.* (1978) 22 Cal.3d 658, 668–669 [150 Cal.Rptr. 250, 586 P.2d 564].) The Board concluded in *Nabors I, supra,* 70 Cal.Comp.Cases at page 862, that Senate Bill No. 899 (2003–2004 Reg. Sess.) did not overrule use of formula A and that that formula should continue to be employed. The Board's conclusion was not clearly erroneous and is entitled to deference.

Those Courts of Appeal reaching the opposite conclusion—the Fifth District in *Dykes;* the First District, Division Two, in *Nabors II;* and the First District, Division Three, in *Brodie*—reached that conclusion through a common line of reasoning. First, the repeal of section 4750 demonstrated a

---

[14] While formula C ensures that all employees with a certain level of permanent disability receive the same compensation, formula A ensures that all employers responsible for a certain level of permanent disability pay the same compensation. Thus, each formula ensures equality—just equality from a different perspective, one employee-based and the other employer-based. Formula B ensures neither equality, but does arrive at a rough compromise between the two perspectives.

legislative intent to change the law of apportionment. Second, the new language of sections 4663 and 4664 does not dictate any particular approach. Third, section 3202, the statutory rule of liberality, requires that uncertainties be resolved in favor of an extension of fully compensatory benefits. Because the new statutory language is ambiguous and grants some measure of latitude, these courts reason, each settles on an original or modified version of formula C, the formula most generous to injured workers. (*Dykes, supra,* 134 Cal.App.4th at pp. 1550–1553; *Nabors II, supra,* 140 Cal.App.4th at pp. 223–225, 228.)

■ The problem with these analyses is in the very first step. It is true that wholesale changes in language generally signify an intent to change existing law. (See *People v. Mendoza* (2000) 23 Cal.4th 896, 916 [98 Cal.Rptr.2d 431, 4 P.3d 265].) ■ As we have discussed, the Legislature *did* intend to significantly alter the law of apportionment—just not *this* aspect of the law of apportionment, the formula for computing an apportioned award after the employer/insurer's percentage liability has been determined.

Given the apparent absence of any legislative intent to change the law in this regard, we have no occasion to resort to reliance on the statutory rule of liberality as the Courts of Appeal did. Section 3202 is a tool for resolving statutory ambiguity where it is not possible through other means to discern the Legislature's actual intent. It is of little or no use here, where other tools permit us to divine that the Legislature did not intend to amend settled law and alter the status quo concerning the appropriate formula. (See *Fuentes, supra,* 16 Cal.3d at p. 8.)

■ In the end, the relevant portions of Senate Bill No. 899 (2003–2004 Reg. Sess.) and the history behind them reflect a clear intent to charge employers only with that percentage of permanent disability directly caused by the current industrial injury. The tables in section 4658 are for compensating the current injury only, not the totality of an injured worker's disabilities; a 30 percent disability is a 30 percent disability, not a 90 minus 60 percent disability or a 60 minus 30 percent disability. The changes wrought by Senate Bill No. 899 (2003–2004 Reg. Sess.) affect how one goes about identifying the percentage of permanent disability an employer is responsible for, but not how one calculates the compensation due for that disability once a percentage is determined. We disapprove *E & J Gallo Winery v. Workers' Comp. Appeals Bd., supra,* 134 Cal.App.4th 1536 (*Dykes*), and *Nabors v. Workers' Comp. Appeals Bd., supra,* 140 Cal.App.4th 217 (*Nabors II*), to the extent they are inconsistent with this opinion.

## DISPOSITION

For the foregoing reasons, the Court of Appeal's judgment in *Welcher* is affirmed and the Court of Appeal's judgment in *Brodie* is reversed and remanded for further proceedings consistent with this opinion.

George, C. J., Kennard, J., Baxter, J., Chin, J., Moreno, J., and Corrigan, J., concurred.